**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190244-U

Order filed March 22, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0244 Circuit No. 15-CF-697 |
| ALEX F. COLLINS, | ) ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding |

_____

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court.
Justices Lytton and Hauptman concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Motion for directed verdict improperly denied when State's case-in-chief failed to present evidence of predicate felonies underlying felony murder charge. The trial court did not err when it denied defendant's motion to suppress. Defendant was not provided ineffective assistance of counsel.

¶ 2     Defendant Alex F. Collins was convicted of felony murder and attempted first degree murder following a bench trial and sentenced to consecutive terms of imprisonment of 60 years and 35 years, respectively. We reverse the felony murder conviction and affirm defendant's

attempted first degree murder convictions and the trial court's rulings on the lineup and ineffective assistance of counsel.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant Alex F. Collins was charged by indictment with two counts of first degree felony murder predicated on robbery and burglary (720 ILCS 5/9-1(a)(3) (West 2014)); three counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(3) (West 2014)); and three counts of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2014)). The charges arose from an incident at a home on Flora Street in Peoria. Defendant, along with Kiangelo Marshall, Kainen Lacy and Sam Clay, shoved their way into the house and shot and injured Kameron Motteler, Isaiah Smith, Jordan Woods, and killed Tommie Forest III. Atlanis Baker was also at the house, but she was not shot. Woods identified defendant in a photo array immediately after the incident. Baker was shown two photo arrays, one of which included defendant, but she could not make an identification. Several days later she identified defendant from an in-person lineup.

¶ 5        Defendant filed a motion to suppress the identifications made by Woods and Baker, asserting they were the result of suggestive procedures. He claimed the photo array provided to Woods consisted of an overly large head shot of defendant in comparison to the other photographs and the defendant's physical characteristics differed from those of the other individuals in the lineup. Defendant claimed Baker's identification was tainted by conversations she had with a police officer after the photo array and by news accounts she heard about the shooting.

¶ 6        A hearing took place on defendant's motion to suppress. Matthew Ray, a City of Peoria police officer, testified that he interviewed Baker two times, once after the incident and again after the lineups took place. In her initial interview, Baker said she would be able to identify the intruder. She described him as a white man, five feet eight inches to five feet nine inches in height and

weighing approximately 150 pounds. Ray could not recall that Baker stated in the initial interview that she did not know any of the intruders. Baker participated in two photo arrays but did not make any identifications in either showing. Defendant's photograph was in the second array. After the second photo array, Baker asked Ray if defendant was in the lineup to which he instructed she should trust her instincts the next time. She told Ray she heard the shooter was "White Boy Alex."

¶ 7        Ray also interviewed Woods twice, once in the hospital immediately after the incident and later at the police department. Woods recognized "White Boy." He said he had a good look at defendant in the backyard. Woods saw defendant as Woods was fleeing. In the second interview, Woods described the suspect as a white boy with pulled back or puffy hair under a hat. In a photo array, Woods identified defendant.

¶ 8        On cross-examination, Ray admitted that in his conversation with Baker after the photo arrays, he told her to stay strong and to stay mad. He also told her that he thought she was scared and suggested the fear impacted her ability to identify defendant.

¶ 9        Craig Williams, a Peoria Police Department detective, administered the photo arrays to Baker. Videos of the lineups were shown. Williams said that Baker initially pointed out defendant in the second photo array but did not identify him. She also pointed to a second person.

¶ 10        Robert Wagner, a Peoria Police Department officer in the juvenile detective bureau, administered the photo array to Woods, who identified defendant. A copy of the photo array (State's Exhibit No. 3B) was admitted into evidence.

¶ 11        Felicia Smith, a juvenile detective with the Peoria Police Department, testified that she helped Ray with the in-person lineup for Baker. Baker identified defendant at the lineup. State's Exhibit No. 4 was a still photograph of the in-person lineup. She described three individuals in the lineup had shorter hair than defendant, two persons had shaved heads, and one person had

3

blondish-brown dreadlocks. She acknowledged that defendant did not wear his hair in dreadlocks and that the shaved heads were distinct from defendant's hairstyle.

¶ 12        Jason Leigh, a Peoria Police Department violent crimes detective, testified. He prepared two photo arrays for Ray and explained the process of creating the array. He took a photograph of defendant, whose name he obtained from another officer, and downloaded it into a program that generated a pool of individuals with similar physical attributes. From that group, he chose five individuals who looked similar to defendant. The source of the pool was the Peoria County mug shot database. On cross-examination, he agreed that although the suspect's description was a white male with long hair in a ponytail, the photo array with defendant in it only had persons with short hair, including defendant, because defendant's mug shot photograph was two years old.

¶ 13        Atlanis Baker testified. She was at the house on Flora Street with Forest and Motteler's younger brother around midnight on October 10, 2015. Woods, Motteler and Smith arrived within 30 minutes. She heard knocking on the door on three occasions. First, the later arriving group knocked. When the second knock came, she and Forest were seated on the couch, Motteler was in a chair next to the couch, Smith was in a chair across from the couch, and Woods was standing. The couch was about 50 feet from the front door. It was Clay at the door and he asked if Taliban was there. The group said no, Clay looked around and left. Baker was still on the couch when the next knock came. Motteler and Woods started toward the door but Motteler told Woods not to approach. Motteler answered but did not open the door. The person at the door told Motteler a mutual friend said the outside group should come over. Motteler opened the door and then told everyone inside the house to run.

¶ 14        Baker remained on the couch. Four or five individuals entered the residence but she only looked at defendant; everyone else was blurry. Defendant was the first person through the door

and she only saw one white person and a whole bunch of black individuals. She told the police that she said, "don't shoot me, don't shoot me." After 20 or 30 seconds, she put her head down and did not say anything. The intruders were pointing guns at them. The intruders looked surprised. She saw weapons but could not describe them. She also could not remember the hats or clothing the intruders were wearing. After they left, she went to the kitchen and hid by the refrigerator. She did not recall telling the police at her initial interview that she did not recognize anyone "because [she] obviously recognized him." She clarified that she did not know the defendant. She did not pick him out of the photo array because the photograph did not look like him. She saw news content and social media and heard rumors about the shooting. She saw arrest photographs, including defendant, on the news after she participated in the in-person lineup.

¶ 15        On cross-examination, Baker modified her estimate of the distance between the couch and door to 20 feet. She was focused on the white person. All the intruders had guns. They ran out the front door. When she was hiding in the kitchen, she heard shots fired. She had seen defendant two days prior in a vehicle with Lacy and had seen him around Peoria. In the second photo array, she pointed to two individuals she thought could be the intruder. On redirect examination, she clarified that defendant was not the first person through the door but she only saw him. She denied initially telling the police that defendant did not have a gun. She admitted her memory would have been fresher in the first interview.

¶ 16        Jordan Woods testified. On October 10, 2015, he was 15 years old and a high school student. He was at a house on Flora Street with Motteler, Smith, Forest and Baker. They were "hanging out" and playing video games. There was a knock on the door, which Motteler answered. The individuals at the door tried to force their way inside and he fled out the back of the house with the others. The intrusion was fast, stressful and he was scared. He heard shots fired before he

5

reached the back door. He could see in the backyard from the lights inside the house. He ran back into the house because Forest was calling for him. Forest was shot and Woods ran back outside. He saw defendant as he was fleeing the house, noticing defendant's hair and that he was dressed all in black. Woods said he "noticed him enough to know that was him." He tried to jump the fence but his clothes got stuck. After he freed himself, he went to Motteler's house next door. In his police interviews, he described the shooter as a white guy with "poofy" hair in a hat. He saw stories about the shooting on the news. On cross-examination, Woods identified defendant in court as the man he saw outside the house. He said defendant was on the left side of the house and came around the corner. Woods saw him and ran to the right. He did not see a weapon. He saw a photograph of defendant on television after he identified defendant in the photo array.

¶ 17    Jason Spanhook, a former violent crimes detective with the Peoria Police Department, testified. He prepared a photo array at Ray's request. He started with defendant's name and looked through the county mug shot database for comparable individuals. Since there were no recent photos of defendant in the county's mug shots, he accessed the secretary of state's database and obtained defendant's photo. He cut and pasted the photos and created the photo array. He did not alter any photos. He described that the photograph of defendant was the only one in the photo array where teeth were showing. Only part of his collar showed while the entire collars of the other individuals showed. Defendant's head appeared larger than the other individual's heads. On cross-examination, he explained that he could not search the secretary of state website by appearance so he used the county mug shots to find other similar-looking individuals. The birth dates of the individuals in the lineup were: July 2, 1982, May 6, 1972, January 29, 1984, October 7, 1975, March 17, 1982. Defendant's date of birth was May 19, 1994. Although the birth dates were different, all the men were approximately the same age when the mug shots were taken.

¶ 18 The trial court denied defendant's motion to suppress Woods's and Baker's identifications. It found that defendant's arguments went to the weight of the identifications, not their admissibility.

¶ 19 A bench trial took place. Several Peoria Police Department officers, including Brian Skaggs, Dustin Barnett and John Williams, who responded to the scene of the shooting, testified that they did not see any drawers in the house that appeared to be rummaged through and there were no exposed wires as from a missing television. There was no evidence of pilfering or robbery. A cell phone was charging in the kitchen and a 9-millimeter Glock handgun magazine, a television, and a scale with white residue were present in the living room. Bullet casings were found outside the house in the front yard and back yard, and inside the living room and kitchen. There were no fingerprints on the casings. Forensic evidence indicated there were two firearms used. Eight fired cartridge casings from a .22-caliber firearm were found, as well as three 9-millimeter Lugar caliber cartridge casings. Williams further testified regarding the crime scene evidence, including State's exhibit No. 13, which was a cellophane baggie with a green leafy substance in it, which he said was found in the alley behind the garage.

¶ 20 Keondra Walker testified. She knew Forest and the other victims. At the time of the shooting, she lived with a friend on Peoria Street. Individuals would come and hang out at their place. On the night of the shooting, the defendant, Marshall, Clay, Oso and Tidy were partying there. She went to bed at 10 p.m. and the group was still there. When she awoke the following morning, everyone who had been there the night before, including defendant, was asleep on the apartment floor. She saw defendant sleeping by the closet.

¶ 21 Isaiah Smith testified. He was 18 years old at the time of trial and 15 years old when the shooting took place. That night, he went to a haunted house with Woods, Motteler and Forest, who

were all high school friends. They then went to the house next door to Motteler's with Baker and Motteler's brother. Smith was playing a video game and Forest was using Smith's phone, and the others were on their own phones. Motteler answered a knock at the door, someone asked for Taliban who was not there, and then left. Taliban was a friend of the homeowner. At the second knock, the group at the door said to stop playing and kicked in the door. Motteler was struggling to hold the door closed and everyone ran to the back of the house. Smith ran after he saw a gun poked through the door. He did not see any individuals. The back door was three steps down from the kitchen and he was shot in his right thigh before he reached the landing. He ran out, jumped the fence and went next door. No one was home, so he ran to a friend's house and then went to the hospital. He later had surgery to remove the bullet. He did not know where his friends were when he fled. He heard shots in front and in back of him. On cross-examination, Smith said the incident was pretty quick and very scary. No one tried to rob him or the premises.

¶ 22        Jordan Woods testified. He was at the house on Flora Street "chilling" with his friends. Motteler and Smith were on the couch and he was in a lawn chair by the front door. Motteler answered a knock on the door, he saw a gun exposed through the door, he closed the door on the intruder's arm causing the gun to fall and then it fired, and he ran. He went through the kitchen to the back door, which was boarded. It took 45 seconds to open it during which time he heard gunshots and yelling. After the door was opened, he heard a gunshot which hit Motteler, who then fell on him. He picked his friend up and they went out the door. He went back in to help Forest when someone shot him. He ran out and saw someone else who started shooting. The person was at the corner of the house about 10 feet away. He recognized the face and gun; it was a white guy. He ran the other way, tried to hop the fence but became stuck on it, got shot, and played dead. He was shot in the arm and back. He identified defendant from a photo array and identified him in the

8

courtroom. On cross-examination, Woods said there was no threat of robbery. No one said, "this is a stick up" or "give us your drugs." He did not see anything stolen and there was no indication of a robbery. He did not recall that at the motion to suppress hearing he testified he did not see defendant with a gun. On redirect examination, he reiterated that he did see defendant with a gun.

¶ 23    Atlanis Baker testified. She was at the Flora Street residence on her phone when someone knocked at the door. Woods opened it and the person, Clay, asked for Taliban, and left. Five minutes later, there was another knock. When Motteler opened the door, the group at the door had a gun. There were more than three individuals. Motteler tried to close the door, and everyone inside ran. She was on the couch and the intruders came in and held guns in her face. She could only see defendant's face. He stood out because he was white. Everyone else was a blur. She described that defendant looked scared, as did the others. Defendant had a gun. The intruders went outside and she hid in the kitchen. Motteler ran by her and was already shot. Her other friends were trying to open the back door. When they opened it, there were individuals waiting for them outside the back door. She ran to Motteler's house and found him and Woods there. She ran back and tried to pick up Forest after he had been shot. She stayed with him until she went to the police station. She observed two photo arrays but did not identify anyone in either one. She identified defendant in an in-person lineup and in court.

¶ 24    On cross-examination, Baker estimated the encounter in the living room took 20 to 30 seconds and she had her head down for 10 seconds. It was the first shooting she experienced and it was traumatic. Defendant looked afraid, surprised and confused. She did not hear anyone say, "this is a stick up," "give us your money," give us your drugs," "this is a robbery," or "this is a burglary." She did not see anyone steal or rummage through anything. She told the police it did

not appear to be a robbery. She could not recall that she told the police in an interview on October 12, 2015, that she did not see a gun.

¶ 25 Donterius Berdin, a codefendant, accepted a plea agreement with the State for aggravated battery with a sentencing range of 6 to 30 years. He testified he drove his PT Cruiser to Flora Street the night of the shooting. He was with Marshall, also known as Kilo, and Tidy. Another vehicle, in which defendant, "Oso," Lacy and Clay rode, trailed them. He identified defendant in the courtroom. They wanted to "buy weed" at the house on Flora Street. Clay first went to the door then came back. Marshall went to the other vehicle and talked with Lacy. Everyone exited from both vehicles and started walking up to the house but he did not. Clay came back to get him and as they were walking to the front door, he heard shots. He saw Marshall bumping open the front door and heard shots fired. Marshall pulled out a gun at the front door. He could not see who was there. He could not say defendant was on the porch when the shots rang out. He had seen defendant with a gun earlier in the day. Berdin ran back to his vehicle, waited for the other individuals to join him, and then left. He did not see anyone go to the back of the house. After they fled, the other individuals in his vehicle wanted to go to a nightclub but he dropped them off at a place on Peoria Street where Marshall and Tidy stayed. He did not know if the other vehicle also went there. On cross-examination, Berdin said he could not describe defendant's gun but thought it was an automatic long gun.

¶ 26 Kameron Motteler testified. On October 10, 2015, he was hanging out at the house next door with his friends. He became suspicious and confused after Woods answered the first knock at the door. The individual asked for someone who he had not been seen at the Flora Street residence before, although he knew the person was a friend of the homeowner. Five minutes later, Motteler answered a second knock on the door. When he answered it, someone asked if they had

10

any cannabis. He had a bad feeling and then saw a "dude" bring up a handgun. He tried to slam the door and warned his friends to run. When he was overpowered at the door, he ran to the back of the house. His friends were trying to open the back door. He broke the wood, opened the door, got shot and ran back through the house toward the front. When he opened the back door, he saw a person outside. He heard gunshots everywhere. As he ran by, he saw "[l]ike out of the corner of my eye," someone in a room off the living room. On cross-examination, he said no one said it was a robbery or burglary. He did not see anything stolen or rummaged through.

¶ 27    Craig Williams testified consistent with his testimony at the suppression hearing regarding his administration of the photo array to Baker. The video of the photo array was played. Defendant objected. Smith, who conducted the in-person lineup with Baker, also testified consistent with her earlier testimony regarding Baker's in-person lineup identification. Wagner also testified consistent with his testimony at the suppression hearing regarding his administration of the photo array to Woods.

¶ 28    John Scott Denton, an expert in forensic pathology, testified the deceased was 14 years old and died from a gunshot wound to the head.

¶ 29    The State rested and defendant moved for a directed verdict of acquittal, which the trial court denied.

¶ 30    Kainen Lacy testified for the defense. He was in the Department of Corrections on a plea agreement for aggravated battery with a 25-year sentence. He had known defendant for more than 10 years and never saw him possess a gun. Defendant did not shoot anyone on Flora Street. On cross-examination, he said when they arrived at the Flora Street residence, Marshall knocked on the vehicle window and Lacy got out to talk to him. Clay went up to the house and when he returned, he did not have any cannabis and he was "kind of off." Marshall told him he wanted to

11

rob the house and Lacy said it did not matter to him. Defendant was sitting in the vehicle with the windows rolled up during the conversation. Clay joined them and they told defendant they were all going up to the house "so we can match them." The phrase meant that "They smoke with us, and we smoke with them. It's matching." They went to the house through the alley and around the side of the house to the front door. Marshall was on the porch and it went "haywire" when he stuck a gun in the door. Marshall had a .22-caliber handgun which he always carried with him. Lacy could see Marshall firing the gun. He had just rounded the corner of the house when the shooting started. Only Marshall entered the house. Defendant was on the porch. Defendant was not aware of the robbery plan.

¶ 31        Matthew Ray testified that when he interviewed Baker, she said she did not see any guns because she was looking down.

¶ 32        Defendant testified. He was 24 years old, with a 6-year-old son and a 3-year-old daughter. They lived with their mother. On October 10, 2015, he went shopping for clothes for his son with Lacy and Clay. He dropped off the purchases with his children's mother, where he had dinner and read to his children. He left around 7 or 8 p.m. with Lacy and Clay, who was driving defendant's vehicle because defendant did not have a license. They bought liquor, went to Lacy's house, and played video games until around 11 p.m. Marshall called Lacy to meet him at an apartment on Peoria Street. Defendant described Marshall as a freeloader. However, Marshall owed Lacy money, so he agreed to meet him. Defendant waited in the vehicle while the two men talked. Two other younger individuals were with Marshall. Lacy decided they would pool their money to buy cannabis. Because defendant did not want Marshall in his vehicle, he called Berdin, who had a vehicle and smoked cannabis. Berdin picked up Marshall's group. They decided to see Taliban, Clay's cousin, who sold cannabis.

12

¶ 33    They drove to the Flora Street residence and parked on a side street. Clay walked up to the house. Defendant was arguing with his children's mother on his phone. Marshall went to the vehicle and Lacy got out. The car doors were closed and the windows up while the two men talked. Lacy knocked on the window and said they were going to "match." They all went to the front door. Defendant was still on the phone when he heard a "boom go off by my ear." He saw Marshall with his arm stretched out holding a gun. Defendant did not know what happened but ran to his car and drove back to a house on Peoria Street. Once there, they all gathered in the bathroom to see if anyone was shot. Defendant and Clay went to another room and tried to sort out what happened. He was in shock. He did not have a gun or shoot anyone. He did not talk to Marshall about a robbery. He did not hear the discussion between Marshall and Lacy. He did not know the other individuals in his group had guns. On cross-examination, he said he thought someone in the house was shooting. He had the impression it was a full-fledged shootout. On redirect examination, he said the event happened "super-fast." He was scared and his mind was racing.

¶ 34    The defense rested. The court asked the parties to submit authority as to whether it was bound by the predicate felonies to support the murder charges. It took the case under advisement and issued an oral ruling on March 1, 2019, finding defendant guilty on all counts. Defendant moved to set aside the verdict, which the court denied. The trial court sentenced defendant to consecutive terms of imprisonment of 60 years for felony murder and 35 years for attempted first degree murder. He appealed.

¶ 35                                    II. ANALYSIS

¶ 36    Defendant raises three issues on appeal. He argues he was not proven guilty beyond a reasonable doubt of the predicate felonies necessary to support felony murder, the court erred in

denying his motion to suppress the lineup identifications, and he was provided ineffective assistance of counsel.

¶ 37    We begin with whether the State proved defendant guilty beyond a reasonable doubt of felony murder based on the predicate offenses of burglary and robbery. Defendant argues that the State's evidence was insufficient to sustain his conviction for felony murder under either predicate offense. He maintains the trial court erred when it denied his motion for a directed verdict and when it entered a conviction on the felony murder charges. We agree with defendant.

¶ 38    A directed verdict should be granted "when, at the close of the State's evidence or at the close of all of the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding *** of not guilty, enter a judgment of acquittal and discharge the defendant." 725 ILCS 5/115-4(k) (West 2018). The purpose of a directed verdict in a criminal case is to test whether the evidence is constitutionally sufficient. *People v. Connolly*, 322 Ill. App. 3d 905, 915 (2001). For purposes of the motion, the defendant admits the truth of the facts presented in the State's evidence. *People v. Cazacu*, 373 Ill. App. 3d 465, 473 (2007) (citing *People v. Kelley*, 338 Ill. App. 3d 273, 277 (2003)). In determining the motion, the court considers only whether reasonable minds could conclude the defendant was guilty beyond a reasonable doubt while viewing the evidence in the State's favor. *Id.* (citing *Kelley*, 338 Ill. App. 3d at 277). We review a trial court's decision on a motion for a directed verdict *de novo*. *Id.*

¶ 39    To sustain a conviction for felony murder, the State must prove beyond a reasonable doubt the defendant killed an individual without lawful justification where "in performing the acts which cause the death: *** (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2014). A person commits robbery when he "knowingly takes

14

property *** from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2014). "A person commits burglary when without authority he *** knowingly enters or without authority remains in a building, *** or any part thereof, with intent to commit therein a felony or theft." *Id.* § 19-1(a). Here, the State had to prove that defendant or someone for whom defendant was responsible killed Forest while agreeing to or committing a robbery or burglary. The State did not present any evidence that any property was taken from the victims by use of force or otherwise or that defendant intended to commit a theft or other felony after knowingly entering the Flora Street residence without authority.

¶ 40     We first examine whether the State proved the offense of robbery. None of Forest's friends who were at the Flora Street residence testified that there was a robbery. There was no evidence anyone took any property from the group or made any threats of force to take anything. Smith testified that no one tried to rob him or take anything from the house. Woods said no one threatened him with a robbery or a "stick up" or said, "give us your drugs." He did not see anything taken or any indication a robbery was taking place. Baker did not hear anyone say, "this is a stick up," "give us your money," "give us your drugs," or "this is a robbery." She did not see anyone steal or rummage through anything. She told the police in her initial interview it did not appear to be a robbery. Although Motteler said that he saw an individual in a room off the living room when he was fleeing, he did not see the person rummaging through drawers or stealing items. He also testified that he did not see anything stolen. He did not hear anyone in the uninvited group say it was a robbery. None of the police officers who responded to the scene found evidence of a robbery. Skaggs, a Peoria Police Department patrol officer, said there were no drawers rummaged through at the scene or exposed wires indicating electronics were missing. Patrol officer Barnett testified there was no evidence of pilfering or robbery. John Williams, a crime scene unit officer, testified

15

that per his observations, it did not appear anything was stolen from the premises, and he did not observe any suggestion of a robbery.

¶ 41    The State theorizes that defendant's group planned to rob the high schoolers of their "weed." In support of its theory, the State looks to John Williams's testimony that a baggie containing a green leafy substance was found in the alley behind the house. The State, however, did not establish the baggie contained cannabis or that it was dropped by anyone connected with the Flora Street residence. There was no testimony that the Flora Street group was smoking cannabis. None of the crime scene evidence revealed cannabis paraphernalia. The State did not demonstrate that a baggie of green leafy material belonged to any of the defendants or the victims. Moreover, the evidence that was presented regarding cannabis indicated that defendant's group was pooling its money to purchase cannabis. However, there was no evidence the group inside the house had cannabis for sale. The State's theory is based on conjecture and cannot support a conviction.

¶ 42    The State also failed to present evidence to prove the offense of burglary. The State was required to prove that defendant or those for whom he was accountable without authority knowingly entered or remained within the Flora Street residence with an intent to commit a felony or theft. Arguably, the facts support that defendant's group entered the house without authority. Although Motteler opened the door to admit the group, he immediately attempted to close it to prevent their entry. However, even with proof of unauthorized entry, there was no evidence to support a theft as discussed above. Nor was there evidence sufficient to establish intent to commit a felony besides murder. " '[W]here the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder.' " *People v. Davison*, 236 Ill. 2d 232, 240 (2010) (quoting *People v. Morgan*, 197

16

Ill. 2d 404, 447 (2001). After forcing its way into the house, defendant's group started shooting their weapons, which act resulted in Forest's murder. The State did not present evidence of any other felony. The act of shooting, inherent in Forest's murder, could not establish an independent felony to satisfy the elements of burglary and thus could not satisfy the predicate felony necessary to sustain a conviction for felony murder.

¶ 43        Because the State did not prove either predicate felony beyond a reasonable doubt, we find the trial court should have granted defendant's motion for a directed verdict on the felony murder charges at the close of the State's case-in-chief. Defendant failed to renew his motion for directed verdict at the close of evidence but asks this court to review the issue under the plain error doctrine or as ineffective assistance of counsel. The plain error doctrine allows unpreserved error to be considered where clear and obvious error occurred and the evidence was so closely balanced that the error tipped the scales of justice against the defendant or where the error affected the integrity of the judicial system, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. Here, the evidence of felony murder was not closely balanced. As discussed above, there was insufficient evidence to support either burglary or robbery. Although first prong plain error review is not applicable, we find review is appropriate under the second prong of plain error. The State is required "to prove every element of an offense beyond a reasonable doubt" to afford a defendant due process. *People v. Woodrum*, 223 Ill. 2d 286, 308 (2006). The State failed to prove the elements of robbery or burglary as predicates for felony murder, depriving defendant of due process. Because we resolved this issue under the plain error doctrine, we will not address defendant's ineffective assistance of counsel claim.

¶ 44        Having determined that plain error occurred and the State failed to prove felony murder, we reverse defendant's felony murder conviction outright. Defendant was also convicted of three

17

counts of attempted first degree murder. Those convictions were based on the injuries caused to Woods, Smith and Motteler from being shot. We find the attempted first degree murder convictions are not affected by our reversal of the felony murder conviction. See *People v. Strong*, 129 Ill. App. 3d 427, 431 (1984) (finding convictions for murder, attempted murder and armed robbery unaffected by reversal of conviction for home invasion where offenses had substantially different elements of proof).

¶ 45        The next issue for our consideration is whether the trial court erred when it denied defendant's motion to suppress the lineup identifications. Defendant argues that the trial court should have granted his motion to suppress the identifications made by Woods and Baker, which he alleges resulted from suggestive lineups. In particular, he points to the photo array viewed by Woods in which he argues his head is "significantly" bigger than the other photos. As for Baker, he claims conversations she had with a police officer between the photo array and in-person lineups suggested that she identify defendant as the offender, which she then did.

¶ 46        Where a pretrial lineup that results in an identification is unnecessarily or impermissibly suggestive such that it produces " 'a very substantial likelihood of irreparable misidentification,' " evidence of that and subsequent identifications must be excluded. *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003) (quoting *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994)). It is the defendant's burden to show the identification procedure was impermissibly suggestive. *People v. Enis*, 163 Ill. 2d 367, 398 (1994). The State must then establish with clear and convincing evidence that the witness's identification of the defendant was based on an independent recollection and thus reliable. *Id.* When reviewing a trial court's ruling on a motion to suppress, we will not reverse the trial court's factual findings unless they are against the manifest weight of the evidence. *People*

18

*v. Luedemann*, 222 Ill. 2d 530, 542 (2006). We review the ultimate determination on the motion to suppress ruling *de novo*. *Id.*

¶ 47 Defendant admitted that he was present at the Flora Street residence when the shooting occurred. In addition, Woods, Lacy and Berdin all testified to defendant's presence. We accordingly find that any error that may have occurred in the photo arrays did not prejudice defendant. His presence at the scene was undisputed.

¶ 48 The final issue is whether defendant received ineffective assistance of counsel. Defendant argues that he received ineffective assistance of counsel when defense counsel called Lacy as a witness which allowed the State to ask him about his plan to rob the individuals at the Flora Street residence. He contends counsel's decision to call Lacy was unreasonable and prejudicial and without the testimony the State's case would lack any evidence of a common plan.

¶ 49 A defendant is entitled to effective representation. *People v. Moore*, 279 Ill. App. 3d 152, 157 (1996). Courts presume that counsel's conduct falls within a range of reasonable assistance and involved sound trial strategy. *Id.* The presumption falls where "no reasonably effective criminal defense attorney, confronting trial's circumstances, would engage in similar conduct." *People v. Fletcher*, 335 Ill. App. 3d 447, 453 (2002). Effective representation includes counsel's use of the rules of evidence to protect a defendant from the use of unreliable evidence against him. *Id.* Sound trial strategy "embraces the use of established rules of evidence and procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts." *Moore*, 279 Ill. App 3d at 159. Whether defendant received ineffective assistance of counsel presents a mixed question of law and fact; factual determinations will not be reversed unless they were against the manifest weight of the evidence and the ultimate question of whether counsel's

19

assistance was ineffective is reviewed *de novo*. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222.

¶ 50    In presenting the defense, defendant's attorney called Lacy as a witness. On direct examination, Lacy said he accepted a plea agreement whereby he admitted to a charge of aggravated battery and was sentenced to a 25-year term of imprisonment. He also testified that he had known defendant for more than 10 years and had never seen him possess a gun. Lacy further testified that defendant did not shoot anyone at the house on Flora Street. On cross-examination, Lacy explained that Marshall told him he wanted to commit the robbery. Lacy also said he did not tell defendant about the plan and that they told defendant the group was going inside to smoke "weed." On redirect, he said that the vehicle windows were rolled up when he and Marshall discussed the robbery plan and defendant was on the phone seated in the vehicle.

¶ 51    Defense counsel's use of Lacy as a witness was not deficient representation. Portions of Lacy's testimony were helpful to the defense. He spoke to his long-term friendship with defendant, that he never knew defendant to possess a gun and that defendant did not possess a gun on the day of the incident. Other portions of his testimony aided the State. That Lacy's testimony, in hindsight, was not as helpful as defendant had anticipated it would be does render unreasonable defense counsel's decision to call Lacy as a witness. The decision to call a witness is generally considered trial strategy. See *People v. Pope*, 2020 IL App (4th) 180773, ¶ 70 ("because the decision of which witnesses to call is generally a question of trial strategy, that decision usually cannot be the basis for a claim of ineffective assistance of counsel"). We find defendant did not receive ineffective assistance.

¶ 52                                    CONCLUSION

20

¶ 53       For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed in part and reversed in part.

¶ 54       Affirmed in part and reversed in part.